IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 21-cr-00365-WJM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ROBERT EARL GLASPER, III,

        Defendant.

---

## MOTION TO SUPPRESS STATEMENTS

---

Defendant Robert Glasper ("Mr. Glasper"), by and through undersigned counsel, respectfully moves for an order of this Honorable Court suppressing any and all statements, admissions, and confessions allegedly given by him, whether oral, written or otherwise recorded, which the government proposes to use as evidence against him. In support of this motion, Mr. Glasper states the following:

### **FACTUAL BACKGROUND**

Mr. Glasper comes before the Court charged in a three-count indictment with one count of abusive sexual contact in violation of 49 U.S.C. § 46506(1) and 18 U.S.C. § 2244(b), one count of indent exposure in violation of 49 U.S.C. 46506(2), and one count of simple assault in violation of 49 U.S.C.§ 46506(1) and 18 U.S.C. § 113(a)(5).  *See* Indictment, ECF No. 11.  All three charges arise from events that are alleged to have occurred on an October 25, 2021 Frontier Airlines flight from Sacramento, California to Denver, Colorado.

When the flight landed in Denver, Mr. Glasper was escorted by the flight crew onto the jet bridge where he was met by multiple waiting Denver Police Department ("DPD") officers. DPD Officer David Stolley immediately advised Mr. Glasper of his *Miranda* rights as he was taken into custody and led up the jet bridge and into a separate area of the terminal. *See* Exhibit A (body worn camera footage depicting the encounter, submitted as a conventionally filed exhibit; Mr. Glasper exits the plan at approximately 5:26 on the video and is Mirandized at approximately 5:36); *see also* Exhibit B (Denver Police Department Statement signed by Officer David Stolley).

At approximately the nine-minute mark of the video, and in response to a question, Mr. Glasper tells the police that he thought he had the right to remain silent. *See* Exhibit A at 9:10. The officers' immediate response to Mr. Glasper's invocation of his right to silence was to handcuff and search him thoroughly, removing all of the items from Mr. Glasper's pockets. *Id.* at 9:30 to 10:15. After Mr. Glasper invokes his right to remain silent, the DPD officers continue to talk to him—telling him that he is being accused of masturbating on the plane, that he wasn't asleep on the flight, and that the FBI is coming and that he is facing federal charges. *Id.* at 9:10 to 13:15. Mr. Glasper's brief statements about what happened on the flight come only after the police disregard his invocation and continue to engage in conduct functionally equivalent to an interrogation. Almost immediately thereafter, Mr. Glasper again tells the police that he doesn't want to talk about what happened on the plane. *Id.* at 13:40.

After he was detained for approximately twenty-five minutes inside the terminal, Mr. Glasper was placed into the back of a DPD police cruiser, driven across the tarmac,

and eventually locked in a holding cell at the airport at approximately 9:36 p.m.  *Id.* at 29:00 (taken from the terminal to the tarmac); 42:00 (placed inside the cell).   Upon information and belief, at 12:27 a.m. the following morning, Mr. Glasper's cell door was unlocked so that he could be questioned by FBI Special Agent Brandon Barnes.  *See* Exhibit C (audio recording of the interview, submitted as a conventionally filed exhibit); Exhibit D (Report of Agent Barnes memorializing his October 26, 2021 interview with Mr. Glasper).

Despite Mr. Glasper having previously and unambiguously advised the police that he did not want to talk to them, and in the absence of anything that could be construed as him having signaled a desire to reinitiate a police interview, Special Agent Barnes went into the holding cell where Mr. Glasper was being detained, approximately four hours after he was first placed into custody, and conducted what he characterized as a "custodial interview". *See* Exhibit E, FBI Collected Item Log.

According to Special Agent Barnes's affidavit in support of a criminal complaint, he described the beginning of the interview as follows:

> I also attempted to interview GLASPER with another DPD officer present for the interview. I verbally provided GLASPER with *Miranda* Rights. GLASPER did not appear to initially understand, but eventually responded in the affirmative when asked if he understood. GLASPER repeatedly stared for long periods of time at me without responding to questions. When GLASPER did speak, his words were difficult to understand.

*See* ECF No. 1-1 at ¶ 24.  Towards the end of the interrogation, Mr. Glasper told Special Agent Barnes that the events of the night were all a dream and then asked the agent what

he [Mr. Glasper] had just told him.  *See* Exhibit C at 11:14-12:30; *see also* Exhibit D. Shortly thereafter, the agent terminated the conversation.

## LEGAL ARGUMENT

Because each of the statements described above was obtained in violation of Mr. Glasper's privilege against self-incrimination, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, this Court must preclude the government from being able to make use of them at trial.

I. **Mr. Glasper's Statements Made to Denver Police Department Officers Must be Suppressed.**

The Fifth Amendment provides that "[n]o person…shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. "In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010).  To make a determination if the defendant is in "custody" for purposes of *Miranda*, the Court must consider "the circumstances surrounding the interrogation."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)   One of those circumstances is whether a reasonable person would have felt he was not at liberty to end the interrogation and leave. *Id.*

The *Miranda* safeguards come into play whenever a person in custody is subject either to express questioning or to its functional equivalent.  Whenever law enforcement officers engage in the functional equivalent of direct questioning by either using words or by taking actions that they should have known were reasonably likely to elicit an incriminating response from an individual, the *Miranda* doctrine is implicated.  *Rhode*

*Island v. Innis*, 446 U.S. 291, 300-301 (1980).  And when an individual in custody

invokes the right to remain silent, subsequent statements will be admissible only where

the individual's "right to cut off questioning" was "scrupulously honored".  *Michigan v.*

*Mosley*, 423 U.S. 96, 104 (1975).

The *Miranda* court was explicit about the implications of the police failing to honor

an individual's invocation of his right to silence:

> "Once warnings have been given, the subsequent procedure is clear. If the
> individual indicates in any manner, at any time prior to or during questioning, that
> he wishes to remain silent, the interrogation must cease. At this point he has
> shown that he intends to exercise his Fifth Amendment privilege; any statement
> taken after the person invokes his privilege cannot be other than the product of
> compulsion, subtle or otherwise. Without the right to cut off questioning, the
> setting of in-custody interrogation operates on the individual to overcome free
> choice in producing a statement after the privilege has been once invoked."

*Miranda*, 384 U.S. at 473-474.

Here, there is no real question that Mr. Glasper was in police custody from the

moment he stepped off the plane.  He was taken off of the flight before other passengers.

*See*  Exhibit A, 3:00 through 5:26. Multiple Denver Police Department officers met him on

the jet bridge, handcuffed him four minutes into their interaction with him, and wholly

controlled his freedom of movement both when he was in the terminal and later when he

was in the police holding cell.  Indeed, Officer Stolley implicitly acknowledged that Mr.

Glasper was in police custody when he immediately advised him of his *Miranda* rights at

the outset of their interaction.

Nor can there be any real question that Mr. Glasper invoked his Fifth Amendment

right to silence by telling officers that he "did not want to talk any more".  *See* Exhibit B,

report of Officer Stolley; *see also* Exhibit A at 9:10: "I thought I had the right to remain

silent"; at 13:44: "I don't want to talk about it no more".  But notwithstanding the fact that Mr. Glasper, who was handcuffed by police officers as soon as he invoked his right to remain silent, was both in custody for *Miranda* purposes and clearly communicated to the officers that he did not want to speak with them, the officers impermissibly continued to "talk at" Mr. Glasper about the serious nature of the trouble he faced.

The conduct of the officers here is analogous to the situation that was described in *United States v. Rambo*, 365 F.3d 906 (10th Cir. 2004).  In *Rambo*, the 10th Circuit concluded that an officer who "acknowledged Rambo's request [to remain silent], but told Rambo that he would be charged with two aggravated robberies and that other agencies would want to speak with Rambo", had "exerted further pressure on Rambo to discuss the crimes and [made] a suggestion that despite Rambo's present request to terminate discussion of the topic, he would be questioned further.  *Id.* at  911.  Because of this, the court found that the officer had failed to "scrupulously honor" the defendant's invocation of his right to silence and suppressed the resulting confession.  *Id.  See also United States v. McCarthy*, 382 F. App'x 789, 791-92 (10th Cir. June 16, 2010) (holding that officers failed to scrupulously honor defendant's request to cut off questioning when they continued to discuss the consequences of cooperating or refusing to cooperate after the defendant stated "I don't want nothing to say to anyone").

In this case, far from "scrupulously honoring" Mr. Glasper's invocation of his right to silence, the officers actively worked to undermine it by telling him, among other things, that he was being accused of masturbating on the plane, and that the FBI had been called so that they could lodge federal charges against him.  It is only *after* the officers made

those statements that Mr. Glasper said that anything that had happened on the plane was consensual.  *See* Exhibit A from 10:15 to 13:44.  Because the officers' remarks to Mr. Glasper were designed to elicit an incriminating response and because such post-invocation conduct both violates the dictates of the *Miranda* doctrine and renders his statements involuntary, any and all statements that Mr. Glasper made to Denver Police Department officers must be suppressed because they were obtained in violation of his Fifth Amendment right to silence.

## II.    Mr. Glasper's Statements Made to FBI Special Agent Barnes Must be Suppressed.

Special Agent Barnes conducted a "custodial interview" of Mr. Glasper at 12:27 a.m. on October 26, 2021—nearly four hours after he had been removed from the plane and detained by the police.  *See* Exhibit E.  Special Agent Barnes did so after Mr. Glasper had invoked his right to remain silent and after he had clearly and repeatedly communicated to the police that he did not want to talk with them.  As described above, Mr. Glasper's invocation was not (even prior to Special Agent Barnes's attempt to interview him) scrupulously honored but was instead met both with handcuffs and with continued police pressure to speak.  Special Agent Barnes also interviewed Mr. Glasper without there being any break in his detention or any appreciable change in his circumstances.[1]  The subject of Special Agent Barnes's

---

[1] The discovery provided by the government does not document Mr. Glasper's movements while he was in custody that evening moment by moment.  However, it seems fairly clear that, after Mr. Glasper was initially locked in the police holding cell, he did not leave it until he was transported to the Denver Detention Center where he was detained prior to making his initial appearance in federal court.

interrogation was identical to the one conducted earlier by the Denver Police Department. *Compare with Michigan v. Mosley*, 423 U.S. 96 (1975) (finding that a post-invocation interrogation hours later by a separate officer about a different crime did not violate *Miranda*). And Special Agent Barnes proceeded despite the fact that Mr. Glasper did nothing to initiate the conversation with him. Indeed, it appears from the audio recording that Special Agent Barnes had a DPD officer unlock Mr. Glasper's cell door so that he could conduct the interview.

As this Court has previously explained in *United States v. Santistevan*, 08-cr-00113-WLM, 2011 WL 13174215 at *3, (D. Colo. Oct. 31, 2011) (aff'd by *United States v. Santistevan*, 701 F. 3d 1289 (10th Cir. 2012):

> Once a defendant has invoked his right to remain silent, officers can reinitiate questioning only if: (1) at the time he invoked such right, questioning was immediately stopped; (2) a "substantial interval" passed before the second interrogation; (3) a fresh set of *Miranda* warnings were given; and (4) the subject matter of the second interrogation was different than the original subject. *United States v. Glover, 104 F.3d 1570, 1580 (10th Cir. 1997)* (abrogated on other grounds by *Corley v. United States, 556 U.S. 303 (2009)*). However, this four-part test only restricts the officer's ability to reinitiate questioning; it does not apply if a defendant reinitiates contact with the authorities. *Id. at 1581* (*Mosley* analysis does not apply when defendant volunteered to talk with authorities); *see also United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006)* (same).

*Id.* at *3. *See also United States v. Coriz*, 17-1105-JCH, 2018 WL 4222383 at *6 (same) (also citing *Smith v. Illinois*, 469 U.S. 91 (1984) and *Edwards v. Arizona*, 451 U.S. 477 (1981) for the proposition that a "valid waiver cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation').

Here, despite the passage of time and the provision of fresh *Miranda* warnings, Special Agent Barnes's conduct does not pass constitutional muster.  Mr. Glasper's previous invocation was not, in fact, scrupulously honored by the Denver Police Officers and the subject matter of the second interrogation was identical to the first. Nor did Mr. Glasper reinitiate contact and evince a desire to talk to the police. Because conducting a post-invocation "custodial interview" under these circumstances violated Mr. Glasper's Fifth Amendment rights, any and all statements that Mr. Glasper made during this interview must be suppressed.

In addition, and even if the Court finds that Special Agent Barnes's recitation of the *Miranda* warnings sufficed to cleanse the taint of the government's misconduct by interrogating him after he had invoked his right to silence, Mr. Glasper's statements should also be suppressed because they were involuntary. Both the Supreme Court and Congress have spoken plainly and directly on this issue. If the government wishes to use any of these statements, it must show that his statements were voluntarily made. *See* 18 U.S.C. § 3501(a)&(b). *See also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960) (holding that, in order to be voluntary, a confession must be "the product of a rational intellect and a free will").  To determine whether a statement is voluntary, the court must consider "'whether the defendant's will has been "overborne" or his "his capacity for self-determination critically impaired."'" *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). "The voluntariness of a statement must be determined based on the totality of the circumstances. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991).  The government bears the burden of proving that a

9

statement is voluntary.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  Courts have considered the defendant's cognitive functioning and "emotional instability" as factors relevant to determining voluntariness. *See, e.g., Spano v. New York*, 360 U.S. 315, 322 (1959).

The government cannot carry its burden of demonstrating that Mr. Glasper's statements were voluntary. Special Agent Barnes noted that Mr. Glasper appeared confused during the interview and that he did not seem to initially understand the *Miranda* warnings. *See* ECF No. 1-1 at ¶ 24.  He stared blankly at the agent and was difficult to understand when he spoke.  *Id.*  He also made several remarks that seemed odd.  For example, he told the agent that this was all a dream and asked Special Agent Barnes to remind him of what he had just said moments earlier.  *See* Exhibit C at 11:14-12:30.  Mr. Glasper's statement—confused, difficult to understand, and characterized by odd answers—was not the "product of rational intellect and a free will", *Townsend v. Sain*, 372 U.S. 293, 307 (1963), and does not bear the hallmarks of voluntariness.

It is clear that Special Agent Barnes believed, in part because of the descriptions of Mr. Glasper that he had received from other witnesses prior to speaking with him, that Mr. Glasper may have been under the influence of drugs both while he was on the flight and at the time of his custodial interrogation.  But that only serves to make the voluntariness issue all the more clear because intoxication through drugs is a factor to consider in assessing the voluntariness a confession.  *Beecher v. Alabama*, 408 U.S. 234, 237 (1972).  In *Beecher*, the Court suppressed the confession of the defendant, in part, because he had just been given two large injections of morphine. *Id.* at 236.

Generally, there must be some coercive police activity to find that a confession is not voluntary. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). However, when "a person's compromised mental state is known to interrogating officers, a lesser quantum of coercion is required to call an ensuing confession into legitimate question." *United States v. Hughes*, 640 F. 3d 428, 438-439 (1st Cir. 2011). In this case, the fact that Special Agent Barnes conducted an impermissible post-invocation custodial interrogation provides the requisite level of government coercion. Special Agent Barnes had reason to believe prior to starting the interview that Mr. Glasper may have been under the influence of drugs. His odd and confused behavior during the interview could only have reinforced that supposition. Nonetheless, Special Agent Barnes persisted in conducting an interrogation despite the fact that Mr. Glasper was having a great deal of difficulty answering even very simple questions. Under these circumstances, this Court should find that Mr. Glasper was not able to give a knowing, intelligent, and voluntary waiver of his Fifth Amendment rights and should thus find that his statements were involuntary.

## CONCLUSION

Wherefore, for the above reasons and for any other reasons which may appear to the Court, Mr. Glasper moves that all statements, admissions or confessions, which the government proposes to use as evidence against him, whether oral, written, or otherwise recorded, be suppressed.

Respectfully submitted,


VIRGINIA L. GRADY
Federal Public Defender


*s/ Stephanie Snyder*
Stephanie Snyder
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Defendant


*s/ Kilie Latendresse*
Kilie Latendresse
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Kilie_Latendresse@fd.org
Attorney for Defendant


## **REQUEST FOR HEARING**

Mr. Glasper respectfully requests, pursuant to the Order Setting Trial Date and Related Deadlines at ECF No. 16, that the Court convene an evidentiary hearing on his motion.

*s/ Stephanie Snyder*
Stephanie Snyder
Assistant Federal Public Defender

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2021, I electronically filed the foregoing **MOTION TO SUPPRESS STATEMENTS** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Andrea Surratt, Assistant United States Attorney
Email: Andrea.Surratt@usdoj.gov

Melissa Hindman, Assistant United States Attorney
Email: Melissa.Hindman@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Robert Earl Glasper, III                *via U.S. mail*

*s/ Stephanie Snyder*
Stephanie Snyder
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Defendant